[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This custodial dispute involves a plaintiff wife, aged 34, and a defendant husband, aged 35, who married in Ellington, Massachusetts, on June 17, 1983, nine years ago. It was his first marriage, her second. They have both resided continuously in this state for the past twelve months.
There are two minor children born of this marriage:
 Manuel B. Nardini, Jr., born June 29, 1983, now eight years of age, and Vanessa A. Nardini, born November 4, 1985, now six years of age.
This case is one in which the parents seem more focused on their custodial competition than upon their children, who seem to be the trophies, the symbol of the dispute, rather than the beneficiaries of the four days of courtroom conflict. CT Page 9522
When the facts situation is as conflicted as this, the neutral testimony of the Family Relations Counselor assumes particular importance. Unfortunately, Counselor Gregory Garrity, who had completed his evaluation in March of 1991, and offered his recommendations had become stale. "So many things have happened since." Counselor Garrity was dismissed by agreement of all three parties.
Of the remaining witnesses, Suk Cho Chang, M.D. and Diane Badillo-Martinez, Ph.D were the most helpful and credible. Though hired for purposes other than impartial evaluations, both Drs. Chang and Martinez were able to respond impartially and sincerely. Their testimonies seemed to merge and offer the court a non-partisan view of Mrs. Nardini that became most helpful as a framework from which to make custodial decisions.
The court finds the marriage, twelve days before the birth of their son, began with a sense of reluctance. The parties assumed stereotypic gender roles: Mr. Nardini worked, absented himself from the family home and took control of financial decisions, Mrs. Nardini stayed home and raised the first of their two children. It was not an easy life for either of them. They moved from their native Argentina to Miami, Florida, to Ware, Massachusetts, and then to Connecticut, where they lived in Stamford, Bridgeport and now Waterbury. Their homes have been bled of equity by imprudence and a falling market. The continuing stress of their lives has eroded their affection and focused their energies on their wide-ranging and all-consuming custodial war. Neither party is solely at fault in the dissolution of this marriage.
Each of them has acted with mean spirit and sought to impose pain upon the other. Mr. Nardini removed the children to Argentina for a month without notice to their mother and without affording the children an opportunity to talk to their mother during their extended absence, denying the mother and the children the opportunity to deal with the anxieties caused by the sudden absence. Terrible. But Mrs. Nardini also exhibited a mean spirit when she made a false claim of physical abuse to the police in an effort to have her husband arrested, a claim that compelled the officer on the scene to question the children. The children thus became witnesses to their mother's shame.
The court believes Mr. Nardini was physically violent towards his wife. The testimony that he did her bodily harm was credible. The court also believes Mrs. Nardini retaliated, doing him some physical harm as well. But her occasional physical attacks did not cause him to live in fear. Mrs. Nardini lived in a continuing stressful and fearful atmosphere. Described by Dr. Martinez as hard driven, expecting his wife to silently collaborate in his efforts, he made major family decisions unilaterally. From this atmosphere, Dr. Martinez concluded CT Page 9523 Mrs. Nardini presented significant cognative distortions characteristic of a paranoid delusional disorder and recommended a psychological evaluation of her personality characteristics and coping style.
Exploring the marital history in an effort to evaluate Dr. Martinez' 1990 concern, the court finds that later events show Mrs. Nardini had a base of reality for many of the issues that concerned Dr. Martinez.
First, the court finds that this simple, household woman, living with a husband who testified he used his home computer to detail and record her behavior, could reasonably believe the computer was recording her telephone conversations and could provide printouts of them. Mr. Nardini was using it for that purpose.
Doctor Martinez further reported that Mrs. Nardini holds the "idea that the husband wishes to harm her". The court has a series of dramatic photographs taken at Waterbury Hospital that shows the harm later done to Mrs. Nardini by her husband.
Doctor Martinez also reports she "accuses Mr. Nardini of homosexual inclinations". Mrs. Nardini testified convincingly of the gradual lack of a sexual relationship between them and of her begging Mr. Nardini to participate in the conception of their second child — all without any suggestions to the court of homosexual inclinations. A dramatic representation of a sexual behavior may well have been misinterpreted as a claim of homosexuality.
Dr. Martinez reports Mrs. Nardini "holds the belief he will kidnap the children, and tends to overeact (sic), overprotect and become restrictive." Mrs. Nardini fears proved prescient, but unavailing, during the summer of 1991 when Mr. Nardini removed the children to Argentina for one month without notice.
Finally, in that same evaluation, Doctor Martinez observes:
 "While Mrs. Nardini is highly concerned that the `lawyers' and the husband are out to deprive her of the custody of the children, she is unable to negotiate any form of agreement, and rather views all options with mistrust, and remains non-commital (sic)."
The lawyers and and her husband ARE out to deprive her of the custody of her children. That is why we are gathered together. The inability, or refusal, of a terrified mother to negotiate an agreement for the deprivation of her children is not regarded by this court as an indication of an emotional problem.
Dr. Martinez did agree that if "three or four" of Mrs. Nardini's claims proved to be true, the doctor's use of the possibility of paranoid delusional disorder would be inaccurate. She did note that CT Page 9524 when Mrs. Nardini appeared without her husband the stress and hostility lessened significantly. She agreed the impression she had of Mrs. Nardini in July of 1990 might not be valid today, that Mrs. Nardini may have learned how to handle stress. Finally, Dr. Martinez testified she would defer her conclusions if a competent professional, who had seen her recently and over an extended period of time (19 or 20 times qualified, she agreed), made a contrary assessment. She agreed it was not necessary to employ standardized tests in order to arrive at a valid assessment.
Suk Cho Chang, M.D., a psychiatrist, testified he had seen Mrs. Nardini nineteen or twenty times, the latest visit being two weeks before the trial.
He testified that Mrs. Nardini gradually came to realize that marital difficulties were the source of her anxiety. He advised her to live separately. When she was by herself, he reported, she was so much calmer, he had no reason to doubt she could take care of her children. He never did feel Mrs. Nardini had paranoid delusional disorder. She was capable of the primary care of her children. She was competent to care for them.
Having observed Mrs. Nardini's behavior throughout the trial, and throughout her extended testimony on the witness stand, this court finds no reason to question her ability to withstand even that extraordinary stress. She was a competent witness, raising the possibility that she is stressed primarily by her husband rather than life in general, a situation not unknown to the court.
After reviewing the testimony of each of the parents as well as the other witnesses offered to the court, the court finds Mrs. Nardini to be capable of the primary care of the minor children and finds, further, that it would be in the best interests of those children to be placed in her primary care.
The house in Bridgeport is in foreclosure. All parties agree there is likely to be a deficiency judgment. The Waterbury home is currently for sale. It may produce no equity.
The criminal court system has become involved in this adversarial custodial dispute. Mr. Nardini faces three charges. Mrs. Nardini has also been involved in criminal abuse charges. The claims are intertwined and the equities are extremely difficult to unravel.
Mrs. Nardini is minimally employed. Her skills are modest. Her earning capacity is limited. Mr. Nardini is more fortunate. He is an electronic technician, has taken a series of technical courses, and has enjoyed a steady history of employment with Pitney-Bowes for the majority of their married life. CT Page 9525
Mr. Nardini has a gross weekly income of $701.52 and a net of $553.15 after deducting his federal and state income tax, social security and medical/dental insurance premiums. Mrs. Nardini's weekly income had been a modest gross of $82.50 and a net of $76.20. She testified that she was laid of on the first day of the trial. The family's total net income of $553.15 produces a total Child Support Guidelines recommendation of $226 in child support if application of the Guidelines is found to be equitable and appropriate.
Although neither parent filed pleadings seeking joint custody, defendant father filed an amended complaint doing so, and plaintiff mother waived any objection thereto as well as the twenty day period following the date of amendment.
Having reviewed the evidence and the sworn financial affidavits of each party in the context of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, a finding shall enter that the marriage has broken down irretrievably, a decree of dissolution shall enter and the following orders shall apply:
1. LEGAL CUSTODY
a. The parties shall each have joint legal custody of the minor children. b. Primary physical custody of the children shall be with the plaintiff mother.
2. JOINT LEGAL CUSTODY
a. The joint legal custodians shall consult with one another on major decisions affecting the children's health, education and general welfare. b. If consultation does not produce an agreement after an exchange of views and exploration of alternatives, the primary physical custodian shall have the final decision making power. c. If, however, the primary physical custodian makes a decision that affects the financial interest or obligation of the other parent, the primary physical custodian shall assume those financial obligations, except as the parties may agree. d. Each of the parents shall exert every effort to maintain free and unhampered contact and to foster a feeling of affection between the children and the other parent. Neither parent shall do anything which would estrange the child from the other parent, which would injure the opinion of any of the children as to their mother or father, or which would impair the natural development of any child's love and respect for each of their parents. e. The parties shall have reasonable access to the children while with the other party, including free access by mail and free access by telephone during reasonable hours of the day and early evening. f. The children are not to be taken outside of the State of CT Page 9526 Connecticut without prior written notice to the other parent at least thirty days in advance. Notice is to include a full itinerary, including specific transportation details to the vacation and on return, daily telephone numbers and addresses. During their absence, the parent escorting the children shall have the children make personal telephone contact with the Connecticut parent no less than every other day.
3. VISITATION
a. Defendant father shall have access to the minor children on the second and fourth weekend of each month from Friday at 6 pm, until Sunday at 7 pm. b. During those months with five weekends, defendant father shall have access to the children on the fifth Sunday from 10 am until 7 pm. c. Defendant father shall have access to the minor children each Tuesday and Thursday from 5 pm until 7 pm. d. Each parent shall have reasonable telephone access to the children when in the care of the other parent. This access is not to be used to harass or cause inconvenience. e. When enjoying his access to the minor children, defendant father shall provide all transportation, at mother's option. f. Neither parent shall arrange for special events or activities which coincide with the other parent's access until first receiving an affirmative response from the other parent.
4. HOLIDAYS
a. Defendant father may have four consecutive weeks during July or August with the minor children, and must decide with their mother's approval, the dates thereof no later than May 1 of that year. b. Father's Day — With father annually. Mother's Day — With mother annually. Easter Sunday — Alternate. Mother has 1992. Memorial Day — Alternate. Father has 1992. Labor Day — Alternate. Mother has 1992. Thanksgiving — Alternate. Father has 1991. Christmas Eve — 5 pm to 9 am. Alternate. Mother has 1991. Christmas Day — 9 am to 7 pm. Alternate. Father has 1991. c. Holidays shall take precedence over both the visitation schedule, above, and the school vacations, below. d. Birthdays will be celebrated as they fall within the access schedule.
5. SCHOOL VACATIONS
 a. All school vacations shall alternate between the parents. b. Christmas vacation, excepting Christmas Eve and Christmas Day. Father has 1991. CT Page 9527 February vacation. Alternate. Mother has 1992. April vacation. Alternate. Father has 1992. c. Those Monday school vacations, i.e., Columbus Day, Veterans Day, Martin Luther King Day, etc., shall be added to the weekend they immediately follow. d. School vacations shall take precedence over the visitation schedule, above.
6. VISITATION EXPENSES
a. Any expense or cost involved in defendant's exercise of his access to the children shall be and remain his responsibility and will be paid by him. b. Any such cost or expense shall be separate and apart from, and in addition to, any and all payments to be made to the plaintiff for the support of the children. c. Without limiting the generality of the foregoing, the defendant shall pay all the transportation costs incurred in connection with his access to the children and all costs and expenses incurred during his time with them, including costs of food and lodging, and defendant will not be entitled to any deduction from payments to plaintiff as a result of amounts expended by him during his access. d. Notwithstanding the above, defendant father shall be relieved of one-third of his child support payments during his extended summer vacation weeks with the children.
7. SCHOOL
a. The minor children shall be placed in a Waterbury school after this current semester at St. Mary's School in Bethel is completed.
8. MOTHER'S COUNSELING
a. The results of mother's counseling with Dr. Suk Cho Chang was a factor in the court's decision to award her primary physical custody of the minor children. b. It is the hope of the court that Alida Nardini would continue her counseling with Dr. Chang, at his discretion.
9. CHILD SUPPORT
a. Defendant shall pay plaintiff $226 a week child support as recommended in the Child Support Guidelines. b. The total will be allocated $83 for Manuel, $143 for Vanessa.
10. ALIMONY
a. Defendant husband shall pay plaintiff wife alimony for a period of five years. a. Defendant husband shall pay plaintiff wife $1 a year as CT Page 9528 alimony until the property at 55 Alder Street, Waterbury, has been sold. From the date of that closing, husband's alimony payments shall be $100 per week. b. The court finds plaintiff wife has an earning capacity that renders her capable of earning the same income she showed on her sworn financial affidavit submitted on the first day of this trial, a weekly gross of $82.50 and a net of $76.20. c. Ninety days from the date hereof, if the closing has already taken place, Husband's alimony payments shall be reduced to $80 per week to reflect that earning capacity, whether or not she has found employment. d. When wife's net earnings exceed $76.20 a week, husband's alimony payments shall be reduced by one-third of wife's net earnings, as net income is calculated in the Child Support Guidelines, in excess of that $76.20, until the alimony payments have been reduced to $60 per week.
11. MEDICAL INSURANCE
a. Defendant father shall maintain medical insurance for the benefit of the minor children. b. All unreimbursed medical, dental, optical, prescription, mental health or other expenses related to the children's mental and physical health shall be paid equally by the parties. c. The provisions of 46b-84 (c) shall apply. Mother's counsel is directed to give mother a copy of the statute and to discuss it in detail with her.
12. LIFE INSURANCE
a. Defendant father shall maintain $100,000 of insurance on his life, naming the plaintiff mother as irrevocable beneficiary thereof until both children are eighteen years of age, such funds being intended for the benefit of the minor children. b. Defendant father shall furnish plaintiff mother, at her request, no more than once each calendar year, proof that the life insurance exists in the specified amount, without any liens or diminutions, and that the beneficiary is as required by this order.
13. TAX EXEMPTION
a. Defendant will be entitled to claim Vanessa as his income tax exemption, provided he is current with all payments called for by him in these orders as they may be amended from time to time. b. Plaintiff mother will be entitled to claim Manuel as her tax exemption provided she has been employed for the majority of the year. In the absence of such employment, defendant father may claim Manuel for that year, provided he is current with all payments called for by him in these orders as they may be amended from time to time. CT Page 9529 c. Each party is directed to execute the tax forms presented to them to enable the party entitled thereto to gain the tax exemption.
14. REAL ESTATE
a. Plaintiff wife shall forthwith transfer and convey all her right, title and interest in and to 135 Pembroke Street, Bridgeport, Connecticut, free of any claim thereto to defendant husband.
 i. Husband shall sell said property with all reasonable speed. ii. Husband shall pay, indemnify and hold the wife harmless from any claim, demand, or suit by anyone holding or claiming a lien on said property and for any costs, fees or expenses associated with this property. iii. Until the sale has taken place, husband shall be responsible for collecting the rents from the Bridgeport property and paying the mortgage thereon.
 b. Defendant father has full title to 55 Alder Street, Waterbury, Connecticut, and is directed to sell same with all reasonable speed.
 i. In the event of a sale, defendant wife is to receive 50% of the net profit, if any there be. ii. Defendant husband shall pay, indemnify, and hold plaintiff wife harmless from any claim, demand or suit by anyone holding or claiming a lien on the aforesaid premises. iii. Until the day of closing, plaintiff mother shall have full use of the premises for herself and the children, paying all the living expenses associated with that house except the taxes, insurance and mortgages thereon which defendant husband shall pay.
15. AUTOMOBILES
a. Defendant father is to retain title to his 1991 Pontiac Grand Prix, his Pitney Bowes common stock, Pitney Bowes pension plan and his Pitney Bowes Credit Union savings, all as set forth on his sworn financial affidavit. b. Defendant father is to provide defendant mother with title to an automobile in good working order and shall provide 60% of the funds necessary to maintain that automobile in continuous good working order for one full year from the date of plaintiff's receipt thereof. If plaintiff's car is unavailable to her for more than one day in any calendar month because of the need for repairs, defendant husband will, after that first day, provide her with a substitute in good working order. c. If there is an insurance payment to plaintiff as the result of the damage done to her automobile, defendant is to be reimbursed from that payment for his out of pocket costs in procuring said CT Page 9530 automobile for wife.
16. PERSONAL PROPERTY
a. Plaintiff and defendant shall divide all the personal property located at 55 Alder Street, Waterbury, Connecticut, as follows:
 i. Defendant may have all his personal possessions and all of those items received from his family. ii. Plaintiff may have all her personal possessions and all of those items received from her family. iii. Plaintiff shall have all the children's personality. iv. The balance shall be equally divided however the parties mutually agree. If they are unable to agree, wife shall chose the first item, husband the second, etc., but in no event may the children's quality of life be damaged by the husband's choices. Husband shall limit his choices to non-essential items.
b. In addition, all personal property now in the possession or control of the plaintiff or defendant shall be the sole and exclusive property of that party. c. Husband shall retain his Pitney Bowes pension plan and Pitney Bowes Credit Union Savings and the Pitney Bowes common stock being used as collateral against loans
17. ATTORNEYS' FEES
a. Each of the parties shall be responsible for the payment of their own attorney's fees. b. The fees for the attorney of the minor child shall be paid 65% by the defendant husband, 35% by the plaintiff wife, in equal monthly payments over a twelve month period beginning January 1, 1992, time being of the essence.
18. DEBTS
a. Each of the parties shall be responsible for the payment of those liabilities listed on their sworn financial affidavits.
19. NEGOTIATION
a. The court recognizes that the parties may have mutual preferences that have not been adequately revealed to the court during the trial and which the court may have inadvertently thwarted. Final divorce terms established by the parties themselves are historically more comfortable for the parties to live with and abide by. Therefore, the court empowers the parties to confer and to seek the court's approval of mutually acceptable variations of the court's orders. CT Page 9531 b. For example, there was no testimony offered dealing with school vacations. In the absence of direct insight from the parties themselves, the court filled the void. The parties may wish to deal with that issue themselves. They might wish to suggest the restructure of payments and responsibilities in order to enhance their ability to deal with their complicated financial problems. c. Any such mutually negotiated modifications are to be submitted directly to the undersigned in written form, signed by all three counsel, the plaintiff and the defendant no later than thirty days after this judgment, without costs and without the need to establish a substantial change of circumstances. The court will consider all such mutual submissions. Beyond that date, or before any other court, modifications shall be by the traditional route and must meet all the more formal requirements.
20. APPEAL
All foregoing orders with respect to custody and visitation shall stand and operate as interim orders of this court during the pendency of any appeal.
Joseph L. Steinberg, Judge.